We'll turn to Erica Bentley-Ammonds v. Northwell Health. Mr. Ostroff? Yes, Your Honor. And I can take the mask off? Thank you. Okay, Mr. Ostroff, go ahead. Thank you. May it please the Court. First, I'll just say I am honored and privileged to be here today as I have not had any oral argument in person in about two years. So it's exciting to be here, and it is nice to be here. I'm also particularly honored to be here on this case. My client is a minority woman who worked hard throughout her career and advanced herself and found herself in a very unfortunate situation, which I think we have presented more than enough evidence to allow this matter to go to a jury to determine whether or not she was subjected to discrimination or retaliation. The district court's analysis, I believe, is deficient and finds a lot of factual issues in the defendant's favor as opposed to letting it go directly to the jury. And I'll highlight one example right off the bat. I'm just going to go to pretext for a moment. And with regard to pretext, it appears that one of the various shifting reasons that they gave for terminating my client was this issue of taking back time. And with regard to the issue of taking back time, there is such stark conflicting evidence before the Court. Nora Haragos, who was a decision-maker, and if not the decision-maker in HR, testified specifically that when she interviewed Rosa Lee Raines, who was the payroll administrator, and asked her who was taking back time, she unequivocally testified that Raines told her no one was taking back time. I'd like to interrupt for just a minute, please. I'm sorry to interrupt your narratives. But before you go further into the conflicts you see in the testimony with regard to taking back time, if you could just address the breach of confidentiality, because that was the reason that was referred to, I believe, in the termination order, and that has been cited primarily as the basis for the termination, that your client appeared at a meeting and shared confidential information regarding a co-employee with individuals who weren't supposed to know that information. Would you agree that that was a—even if not every employer would have terminated employment on the basis of such a breach, but that was a breach and that was a legitimate reason for—a non-discriminatory reason for taking the action that Northwell did? Well, first of all, that was one of many reasons, and quite frankly, if this Court finds that any— Excuse me, that was the reason cited in the termination letter, though, isn't that right? No, that was one of multiple reasons cited in the termination letter, but it was cited in the termination letter, but the termination letter did cite other issues as well. And quite frankly, the case law is very clear that if this Court or if a jury can find that any one of the reasons proffered were false or exaggerated, that it can use that to shed light on the other decisions. But I will squarely address what you're asking me about. First of all, the idea that you can disclose confidential information to people who know the information already doesn't make any sense at all. So I do agree that the information was confidential, but if you accept the testimony in the light most favorable to my client, every single person of the five people who were there, one of whom was my client, already knew that he was being disciplined and already knew of the nature of the discipline and the reason for the discipline. And the only reason my client raised it was because they were all in an uproar. Now, my client's a top-level manager. She's managing 45 to 50 people. She's a high-level supervisor. This isn't a low-level person. She has to maintain a smooth operation in her department. And four of her nurses or three of her nurses were very upset that one of them was leaving, and that meant that they were going to have to deal with this problem employee. And they were arguing about that and talking about that. And she was saying, you don't need to concern yourself about that because we are taking care of that. And they are— But wasn't there also an understanding that she said during that report, I guess, that she said thereafter, and don't you say anything about my telling you? Why was that necessary if everyone already knew and it was out in the open? Well, first of all, what you just did was quote something that one of the defense witnesses said as to how it was said, however, my client and other witnesses there say that it was said entirely different. And in my client's version of events, which must be accepted by this court as true, and the version that Your Honor just mentioned shouldn't even be thought of really on this motion, but my client basically says, I said to them, you all know, even though they know the confidential information, you know, already, keep it confidential. Don't tell other people about it because if you do, you could be terminated. Now, how they all—what exact words were used during that conversation, I don't know that anyone remembers the exact words, but I don't think it matters because the import of what she said was absorbed by all those present as she was just either joking or someone didn't even remember it because it wasn't that important, or the other one said that she didn't mean it that way, and their takeaway was just continue to keep this quiet. Don't tell anyone else. So my client doesn't dispute that the information was confidential, but the people she was speaking to already knew the information, so she wasn't really disclosing a confidence. And so that's how we address that. I mean, you have to accept as true that that was emailed twice to all these people, to all the whole department. But there is a difference. I mean, the comparison is not completely on point. When it was disclosed first, it was accidental, and remedial steps were taken. By contrast, I gather your client doesn't dispute that her disclosure was purposeful and that there was no attempt to pull it back or take any kind of remedial action. To that extent, why isn't the employer within its rights to view it as a violation of its practices and policies if it was purposefully done? The question that you're asking goes to the issue of similarly situated. I'm going to address that in a moment. But the reason I raised the emails was not for purposes of a similarly situated comparison. The reason I raised the emails a moment ago is because I'm pointing out that the people that she was speaking to already possessed the information twice of which she was talking about. So it wasn't a disclosure of confidential information. It was a discussion of information that those people already knew about. But as to the similar— That's a lot by your client's own statement that Judge Carney alluded to. She tells them when she discloses it, it's confidential and you could be in trouble for repeating it. But that's like if I'm an attorney-client privileged with my client and I say to my client, don't tell your friends what I just told you because that breaches the attorney-client privilege. That doesn't mean I can't tell them or they don't know this information already. That just means I'm telling them there could be a consequence if you tell a third party who doesn't already know. And even so, under the testimony, everybody in that department knew, but she was just trying to quell additional gossip or discussion about that. But the reality is if you accept as true that both of those emails were sent, then the people my client spoke to already knew the confidence, so she wasn't disclosing a confidence. I mean, she was talking about a confidential information with people who were privy to that confidential information. But I would like to address the similarly situated issue which Your Honor raised as well. Because while I agree, I think there's a real problem with the district courts about similarly situated. It's the courts find if something's dissimilar, then that's it. We don't even think about it. Well, that's not the issue. The issue is whether or not a jury can draw some probative value from a particular piece of testimony. And in this case, it's not — arguably, it's worse when Alfaro did it, because although Alfaro did it accidentally, she did it twice, and she did it to everybody including people who didn't know the information, whereas my client was just talking privately with four people who needed to know the information and already knew it. And secondly, what's also important on the similarly situated comparison is the reaction of the employer. When Alfaro did it once and then did it again twice, the employer was like, eh, don't worry about it. And then lied and said they disciplined her when in fact she wasn't disciplined. But when my client did it, she was fired. So I do understand there's some level of difference between the two for sure, and which mitigation factor, you know, the employer chooses to weigh, I understand. But to literally have no concern whatsoever about the first two breaches and then the third breach, which wasn't even a breach, be so concerned that it warrants the termination of a top-level manager. And by the way, if it was that bad, why are they throwing on all these other pretextual excuses, which I didn't even get to speak about, but they're in my brief. But why not say that's the only reason she was fired? Why do we have different testimony in the affidavits as compared to the deposition testimony as compared to the termination letter? Because they're throwing all kinds of other stuff at the wall. But why isn't the employer, though, entitled to cite the primary reason in the termination letter and then, when challenged, cite additional reasons about performance? They're not necessarily in conflict, are they? Well, they didn't have to give reasons in the termination letter at all. So I agree that they could say whatever they want whenever they want, but the issue isn't whether or not the employer is entitled to say this or where or when the employer is entitled to say it. The issue is whether a jury can infer something from the fact that the employer said different things at different times. And it wasn't only different as compared to the termination letter, to the testimony at the deposition, to different in the affidavits that were prepared and submitted on this motion. And a jury is allowed to say to themselves, look, if this person was really fired and they were really fired for a legitimate reason, why are different people testifying in different ways about the various reasons for her termination? And why are some of these reasons so preposterous that they're probably not even true? And certainly a jury can infer they're not true. So you're asking, can they make a legitimate termination based on a legitimate reason and then throw in a bunch of fake reasons? Yes, they can. But can a jury look at that and say, wait a second, what's going on here? If this was really a proper motive, then why is all this other stuff happening at or about the same time that she's making multiple complaints of discrimination? And within three or four days... But you said at or about the same time. Several months had passed in between, and then we had these incidents of the meeting. Isn't that right? I mean, there was the bong on the desk several months before and then the additional comment by Ms. Wolfe, who was not actually a decision-maker. I'm glad you're raising this... There is some attenuation, wouldn't you agree? No, I wouldn't agree. What I would agree with is, I feel like I was standing here yesterday, but it was really two years ago. I mean, three months is nothing in life. It goes by like a cup of coffee. And also, I don't agree that it was three months, because although the bong comment, which was the first comment, happened three months ago, there were multiple complaints, and then there was the second comment also. And three months, this court has held, and quite frankly, it should be much longer than three months considering how fast life passes us by. Three months is nothing. But three months, this court has held, is well within the bounds of something that could allow an inference for a causal connection. But, of course, in looking at whether an inference is reasonable as to a causal connection, you might also look at the strength of the statement. And the bong comment is somewhat opaque and not so clear. And one could raise questions about the nature of the second comment as well, particularly when it wasn't the decision-maker about termination making the comment. Well, it's interesting that you say one could raise questions about it. And one can raise questions about it. But the questions are to be answered by a jury, not a court. Those are factual questions for a jury to analyze. At this point, we're looking, aren't we, at what is a reasonable inference to draw to determine whether or not a patient case is stated. And is it reasonable? First of all, we switched from temporal, and now we're talking about whether or not those comments reflected discriminatory animus, which is okay. I don't mind switching to whatever topic the court wants to talk about. But when we're talking about whether or not there was a discriminatory animus, then you have the issue of whether or not the plaintiff in her position could have complained about it and perceived it to have been discriminatory and complained explicitly that it was racist, which she merely has to have a good faith basis for. And those are two different things. But quite frankly, I am not a minority. But I could imagine that if I was the only person in a room, and I was the only white person there, and I had struggled my whole life to get to that position, and my supervisor is talking to me in a room full of black people saying she's not a white person. I mean, I'm just going to go back there. She's not a black person, the person we just hired. She doesn't have a black name. First of all, why is that being discussed at all? And why is it being discussed in the context of an employment decision specifically? And more to the point, as to whether or not my client had a good faith basis, with that being the second comment made to her, could that offend her? Could she have believed in good faith that that was race-based? How could she even believe others? She was literally being pointed at. Not black like Erica. And she wasn't the only one who perceived it as troublesome, because somebody else reported it to HR, and other people testified that people's heads were in their hands when the comments were made. But I move back, and I think, what am I going to say to a jury about this? I'm going to say, ladies and gentlemen, what do you think about sitting there in that room, and for no reason whatsoever, your boss is talking about the race of a new hire, and talking about her name, and how it's not like a black person's name, which we all know is something that's discussed, and discussed offensively, quite frankly, that there is a black person's name. It's a stereotype. And that, combined with the first comment, which I do acknowledge is a little more innocuous, but together is the issue. And how she perceived it is the issue for protected activity. Thanks, Mr. Ossoff. Thank you. I've given you as much of the time. Thank you. But we appreciate it. Ms. Gross, where is she? I'm right here. Ah, here you are. I'm just going to make this down. Yes, you can adjust the length here. Great. I'm used to that. Okay. So may it please the court, Barbara Gross from Littler Mendelsohn for the appellant, Northwell Health. Get a little closer to the microphone. Oh, sure. I'm actually going to take this off. Barbara Gross from Littler Mendelsohn for the appellant, Northwell Health, in case number 21835. So Mr. Ossoff keeps telling us we need to look at the totality of the circumstances here. As she says over and over again in her papers, but there's no evidence to support that she was terminated based on her race or retaliation or that any other actions were taken because of that. Instead, it shows that it was because of these timekeeping issues and disclosing confidential information regarding the discipline, which was notably absent from what Ms. Drostrup was talking about in terms of the difference between what Ms. Alfaro was talking about. There is no allegation that Ms. Alfaro ever said that Mr. Joseph was going to be terminated. And this is in his papers. So what he just said to the court misrepresented the record. He just says it could be inferred from having talked about someone's performance. In fact, Ms. Alfaro at her deposition said that she was very surprised at the meeting on September 21st when she heard that Mr. Joseph was going to be actually disciplined. So at least to her, and this is the only testimony on the record about it, it was a surprise. So here we have an employee who admitted she engaged in both time theft, which preceded this, taking the confidential information within a short time that she had just been warned about. Let me interrupt for just a second, if I may. You say she admitted to time theft. I thought she protested the criticism that she got on taking the comp time after she had worked overtime and said she understood that it was a practice, that other employees did that. And the record is ambiguous about whether that was in fact tolerated. The employee handbook didn't say one way or another. And it wasn't so clear to me. And that wasn't cited also in the termination letter per se, as I recall. So I'm not sure that it's quite fair to say she admitted to time theft and that that was a firing offense. Am I misunderstanding? Am I misrecalling something? Sure. So the ultimate reason that she was terminated and the precipitating factor was a disclosure of the discipline, of the confidential information regarding the discipline. However, the termination letter did mention that she had also been warned just about a month before. However, I don't think that there's any ambiguity in the record. While she keeps calling it taking time back, it's just something fictitious that was made up. Whether or not people were doing it, her managers did not approve her doing it. And in fact, for example, Bentley Ammons responded in response to the defendant's 56.1 statement in paragraph 89, and this is at A351-2, when asked about all these other people, which were never mentioned before her termination. This was only brought up as part of the litigation. Who else was taking back time? She admitted that she had no actual knowledge about whether any of the individuals she identified had permission to clock in while not at work on any particular day and that she was either not involved in the timekeeping or in the supervision of each of the individuals she identified. In addition, in her deposition when she was asked about this, she said only that her supervisor was aware she was taking time back. When she was specifically asked, did your supervisor know that you were clocking in on days, that you were taking PTO, she said, my supervisor was aware I was taking time back. She never said that anyone, that her supervisor knew that. Her supervisor, Jerry Randazzo and Elizabeth Wolfe, in their affidavit, denied that they ever gave her permission to do this. At the time of the investigation, Nora Hiragos took notes, and these are contemporaneous notes that are in the record, and in them it says, quote, at 8-3-0-2, no one else is doing comp time. Also at her deposition, Nora Hiragos testified that Ms. Reams, that she asked Ms. Reams as part of the investigation, quote, if she was aware of others punching in while they were away, she said no, she is not aware of anyone else. She was the only timekeeper in the department who had access to the system, so she would know. Nothing in Ms. Reams' deposition, now that investigation while Ms. Reams was still employed, and then later on her deposition was taken after she had already resigned. So Ms. Reams testified after she left Northwell that she reported to Bentley Ammons. She assumed no one would have taken time without permission from a supervisor. That's at 8-2-19. She did not- But Ms. Reams' testimony would seem to establish that taking time back was at least not unheard of at Northwell. That is, this was something that existed, a practice that existed. Well, I think if someone wanted to take a vacation day after they worked on a weekend, sure. What does taking back time even mean? There's nothing that would suggest that her supervisors at the time had any knowledge that anyone was taking back time. I want to ask you about that, in fact. Has anyone else at Northwell ever been disciplined for taking time back? Does the record show us whether anyone else had ever been disciplined? The record does not show. I personally know that people were. But there's no one who was ever accused. There's no knowledge of that, because at the time, Nora Jaragos did her investigation. She talked to the timekeeper in the department, and the timekeeper in the department said no one else was doing it. This was the leader of the department, an exempt employee, who was obviously in a very different position than the other people in the department anyway. But they didn't have any obligation to go. Tell me if I misunderstood, because I perceived a certain inconsistency in what you just said. You said you know that people do this. No, I don't know that people do this. I have a separate case. That it does take place, this taking back time. No, I know that someone was fired for getting caught stealing time. And it happened long after the record went into here. So after she got fired, other people did it, and they got fired too? When I say they did it, it's not this. There are people who, if you caulk in, and you're not working. I'm not asking for an explanation. It just seemed odd to me that you were acknowledging that it happened and people were disciplined. And then at the same time you were saying, but none of the supervisors knew about it. There's no one at the health home that I'm aware of who ever did this. Nobody. There is nobody that the plaintiff testified that she had any personal knowledge about. She said it was undisputed when we said that in our 56.1. There is nobody else at the health home where she worked that we're aware of that engaged in the same behavior. That was not disciplined for it. And in any event, then with regard to the discipline for the confidential information, that was a precipitating event for her termination. And with regard to that, again, the most important fact is that the discipline was not discussed as part of the alleged emails that were sent by Alfaro, who was not a supervisor. And I know Mr. Ostroff is now saying his client made a mistake when his client clearly testified that Ms. Alfaro was not a supervisor. But she was not a supervisor. She did not disclose discipline. She was not accused of telling anyone that they were going to be terminated if they made a disclosure. Erica Bentley Emmons, she was the leader of the organization of the health home. She was going to be held to the highest standard, obviously, while Alfaro, whether there was one or two emails, the only testimony is about accidental emails that were sent that were tried to be retrieved, and there was no intent to do anything wrong. And, in fact, anyway, Alfaro had already resigned at that point. On September 21st, she was moving out of that role. She wasn't even in the health home anymore, so it wouldn't even make sense. I know I'm out of time. If there are any other questions, I'm happy to answer them. I have one quick question. Sure. I was concerned about the statements that are attributed to Ms. Wolfe, who was your client, who was Ms. Bentley Emmons' supervisor. It's a reasonable inference, isn't it, that Ms. Wolfe's views about her supervisee would be transmitted to decision makers when those people are trying to decide whether to terminate Ms. Bentley Emmons for these, whether it was the disclosure of information or other reasons. Isn't it reasonable to infer that Ms. Wolfe's comments and views would have been transmitted to be part of the mix? Because you can't imagine that milder measures could have been taken, corrective measures could have been taken, and that possibly these comments that your friend on the other side points to might have potentially infected the decision-making process. Yeah, sure. So first of all, there were two offenses. So they did take milder measures the first time with regard to the timekeeping practices. So only about a month later did they then take the step of termination. So with the first offense, they actually didn't terminate her. But with regard to the statements, the first statement, well, now she states that the comment to her by Wolfe about keeping a bong at her desk to help in recovering from a knee surgery was racist, or a knee injury was racist. She also testified that Dr. Wolfe had made similar comments to the rest of the staff that they should smoke marijuana to relax. That's at A163. With regard to the second alleged comment, where she alleged that Dr. Wolfe, Ms. Emmons alleged that Dr. Wolfe stated a new nurse did not have a black name like Erica, there's no negative or positive racial connotation on its face. I mean, first of all, these were denied by her. I know the brief says they weren't, but she says she doesn't remember making them. But in any event, one comment, because I don't see how the first comment could be seen as being discriminatory. The second one is a race-based comment that has nothing to do with her job, nothing to do with anything. It was months before. And there were the two intervening things that she admitted she did. And they gave her a break the first time. They terminated her the second time. Thank you, Ms. Phillips. I think we have the thrust of your argument. Okay, thank you so much. And we appreciate it. Mr. Ostroff has had extra time, but he's reserved two minutes as well. So go ahead. Thank you. I'll leave it with you to those two minutes. Thank you. Nora Haragos testified at page 202. What was the reason for that termination? Answer. It's because of time back issue and her disclosing confidential information technically to staff employees' lack of judgment. So this time back issue is critically important.  It's more than ambiguous. Barbara Gross wants to take her client's version of testimony and ignore all other versions. But the fact that there's competing versions of it is something that lets it go to a jury. So Nora Haragos says, no one else took back time. But my client, but when Rosalie Rains, well, let me be clear. Nora Haragos testified that Rosalie Rains, when she investigated, had said to her, no one else took back time. No one. And it's even in her notes at 302. But Rosalie Rains testified the exact opposite. She testified that during that meeting. She said, but Nora, we've been doing this forever. Next time I mean, this is what we've done. If it's wrong, it's something you say I shouldn't do, I just won't do it anymore. And she said, well, don't do it anymore. And I said, fine. And that was it. Let me ask you, is there anything in the pleadings that identifies what race or what group it is that went undisciplined for this action? Well, there is. I understand that. I'm not sure I saw anything in the evidence or the pleadings that said that so and so who was white or so and so who was male did it and didn't get disciplined. There is certainly evidence in the record that none of the other 14 people that my client and Ms. Rains identified did it, had made complaints of discrimination. So if you want to use a similarly situated comparison, you have somebody who made complaints of discrimination now is being disciplined for. But I'm not sure that's good enough on summary judgment. Don't you have to come forward with evidence that the people who went undisciplined were not members of the suspect class? Well, they're not on the retaliation claim is the point that I'm making. I'm now asking about the- I understand that. Okay. But to the extent that you accept that on the discrimination claim, we have it locked up on the retaliation claim. As to the discrimination claim, there were 14 other people who were alleged to have done it. There is some testimony about some of their races in there. I can't point the court this second to the notion of who everybody's races are. But I think the broader point here is that my client made complaints of racial discrimination and was disciplined for something that at least 14 other people knew about. And then the HR manager who fired her for it lied about what her investigation revealed, if you believe Rosalie Rains, which a jury is entitled to believe her. Thanks very much, Mr. Astor. Okay. Thank you. Nice to see you both, and we appreciate the arguments of both. We'll reserve decision, and we are adjourned. Court stands adjourned.